**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | |
|---|---|
| **BRITTANY DAVIS,** As Next Friend, Sole Custodial Parent, Natural Mother and Guardian, J.W., a Minor and only Surviving Dependent and Beneficiary/ Heir of John Williams, Jr., Deceased, **Plaintiff,** | ) ) ) ) ) ) ) |
| vs. | ) **CIVIL ACTION: 1:21-00005-KD-M** |
| | ) |
| **JUSTIN GRANT,** *et al.,* **Defendants.** | ) ) ) |

**ORDER**

This matter is before the Court on Defendant M.C. Dean, Inc.'s motion for partial summary judgment (Doc. 35), Plaintiff's Response (Doc. 39), and Defendant's Reply (Doc. 41); Defendant's motion to exclude (Doc. 40), Plaintiff's Response (Doc. 46), and Defendant's Reply (Doc. 47); and Defendant's Objection (Doc. 42) and Plaintiff's Response (Doc. 45).[1]

I.   **Findings of Fact**[2]

This litigation arises from a November 30, 2020 motor vehicle accident in Castleberry, Alabama, involving Plaintiff Brittany Davis (Davis)' decedent John Williams, Jr. (Williams) and

---

1 MCDean moves for summary judgment on the presence of fictitious parties in this case. "As a general matter, fictitious-party pleading is not permitted in federal court[]" and there is no indication that the limited exception to this rule applies. Richardson v. Johnson, 598 F.3d 734, 738 (11th Cir. 2010) (per curiam)).  Thus, any fictitious parties in this case are **DISMISSED.**

Additionally, given that Alabama wrongful death claims only allow for the recovery of punitive damages, Davis has abandoned any claim for wrongful death compensatory damages in Response to summary judgment (Doc. 39 at 12), and thus such is **DISMISSED.**

2 The facts are taken in the light most favorable to the non-movant. Tipton v. Bergrohr GMBH– Siegen, 965 F.2d 994, 998–999 (11th Cir. 1992). The "facts, as accepted at the summary judgment stage of the proceedings, may not be the actual facts of the case." Priester v. City of Riviera Beach, 208 F.3d 919, 925 n. 3 (11th Cir. 2000).

Defendant Justin Grant (Grant) (employed by Defendant M.C. Dean, Inc. (MCDean)).  Grant was employed by MCDean at the time.  Tragically, Williams and Grant died at the scene.

MCDean has a written vehicle safety policy regarding driver qualifications for non-commercial drivers such as Grant for its "Fleet Safety Program." (Doc. 35-3).  MCDean also has technology installed in its vehicles called Geotab to monitor the vehicle's location, speed, and mechanical performance. (Doc. 35-9 at 6-7 (Dep. Beatty at 41-42)).  MCDean's vehicle safety policy provides that drivers with traffic violations for driving "more than nineteen (19)" miles per hour above the speed limit or with over seven (7) points are not authorized to operate company vehicles.  (Doc. 35-3 at 2).

When Grant applied, MCDean performed a background driving check on him and obtained a motor vehicle report indicating two (2) traffic infractions (use of wireless device in 2018 and speeding at 19 mph over the speed limit in 2020) for a total of six (6) points.  (Doc. 35-1 at 2-3; Doc. 35-2; Doc. 35-9 at 3 (Dep. Beatty at 21)).  As such, at the time he was hired as a service technician, Grant met MCDean's driver standards. At that time Grant also received defensive driver training as part of his orientation as well as successfully completed a drug test.  (Doc. 35-9 at 4 (Dep. Beatty at 144)).  Grant's immediate supervisor while employed with MCDean was Kent Bowman (Bowman), who was based out of MCDean's Atlanta office.  (Doc. 35-4 at 3 (Dep. Bowman at 9)).

For the 14 months that he was employed thereafter until the accident, Grant worked without any incidents or traffic violations, and performed his job without receiving any warnings, corrective intervention, or discipline. (Doc. 35-9 at 5 (Dep. Beatty at 68); Doc. 35-11 at 3 (Dep. Reynolds at 50); Doc. 39-2 at 11-12 (Dep. George at 36-37)).  Grant did not receive any visual offense or speeding events (which occur when MCDean's Geotab program registers a driver

driving 10 miles over the speed limit for more than 5 seconds) or any other occurrences that would have led MCDean to flag his driving habits. (Doc. 39-4 at 167 (Dep. Bowman at 128)).   While employed, Grant worked 7-day timeframes, broken into shifts and with time off in between (versus a 5 day work week).  (Doc. 39-8; Doc. 39-2 at 27, 29 (Dep. George at 55, 57)).

Prior to the November 30, 2020 accident Grant had been off work for 4 1/2 consecutive days for the Thanksgiving holiday (Thursday-Sunday).  On November 29, 2020, Bowman called Grant at his home in Georgia to ask him to travel out of state to cover a service area normally handled by another employee (the Florida panhandle area from Mobile, AL to Tallahassee, FL). (Doc. 39-4 at 2 (Dep. Bowman at 51)). Grant agreed and Bowman assigned him work tickets - one for a Home Depot store in Daphne, AL and one for electrical work at a Home Depot in Mobile, AL.  (Docs. 35-12, 35-13, 35-14).  Around 6:15 p.m., Bowman again called Grant to update him on a new assignment which would adjust his schedule: an electrical repair at a Home Depot in Pace, FL which was categorized as an "emergency" request.  (Doc. 35-4 at 4 (Dep. Bowman at 61); Doc. 35-13; Doc. 39-4 at 2, 7, 9 (Dep. Bowman at 51, 61, 63)).  The schedule was for Grant to go to Mobile, Alabama first to service the two (2) calls in Mobile and Daphne, and then to stay overnight in the area and the next day travel on to FL. (Doc. 39-4 at 2, 7-8 (Dep. Bowman at 52-54, 61-62)).  According to Grant's girlfriend, Vonique Sanks, Grant told Bowman that he was tired, but would take the job. (Doc. 39-5 at 2 (Dep. Sanks at 15)). See also (Doc. 39-6 at (Dep. Whitehead at 18-19, 21)).

After the call between Grant and Bowman, Grant's activities consisted of the following (EST time): he went to bed around 10:00-11:00 p.m. (Doc. 39-5 at 4 (Dep. Sanks at 18-19)); logged into the MCDean system at 1:58 a.m., logged out at 2:19 a.m., logged into the system at 4:02 a.m., accepted the FL assignment at 4:03 a.m., logged out at 4:23 a.m. (Doc. 39-7); and left his house in

Georgia at approximately 5:07 a.m. (EST). (Doc. 35-5).  The foregoing suggests that Grant could have slept for a maximum of six (6) hours.

On November 30, 2020, the Geotab for Grant's work vehicle (a Chevrolet work van owned by MCDean) indicated that he traveled a total of 265 miles with a top speed of 85 mph.  (Doc. 35-5; Doc. 35-9 at 8-10 (Dep. Beatty at 76, 74, 153)).  The Geotab also indicated that Grant traveled on I-65 Southbound near Greenville, AL, where he went through a drive through at a Burger King off the interstate.  (Id.) Then approximately 45 miles later, he arrived in Castleberry, AL, where the collision occurred.  (Id.)

Specifically, at the time of the accident, Grant was driving on Highway 31 and approached a curve on the right side of the highway, crossed the center line, and collided with another driver John Williams, Jr., who was driving a commercial tractor-trailer in the left lane.  (Doc. 39-2 at 6 (Dep. George at 16); Doc. 39-4 at 16 (Dep. Bowman at 126)).  Due to the collision, the ladder and rack attached to Grant's commercial van dislodged on impact and was propelled through Williams' windshield on the driver's side.  (Doc. 35-10 at 22 (Plf. Expert Johnson Report)).  At the time of the collision, Grant was speeding (driving 63 mph in a 55 mph speed limit zone) and had been driving for 3 hours 34 minutes without a break.  (Doc. 35-10 at 16, 22 (Plf. Expert Johnson Report)).

On December 11, 2020, Davis initiated an Alabama wrongful death action against the Defendants in the Circuit Court of Conecuh County Alabama.  (Doc. 1 at 9-14).  On January 5, 2021, Defendants removed the case to this Court based on federal diversity subject matter jurisdiction. (Doc. 1).  On September 7, 2021, Davis filed an Amended Complaint alleging various theories of liability: negligent/wanton entrustment; negligent hiring, supervision, training, retention; negligence/wantonness; and loss of consortium. (Doc. 17).

II.   **Objections**

MCDean moves to strike and objects to certain evidence submitted by Davis in Response to summary judgment: 1) deposition testimony from non-parties that "I heard Justin tell Kent Bowman that he was tired[;]" 2) Grant's work schedule in the months before the accident; 3) an accident occurring after the one in this case; and 4) Bowman's alleged post-accident comment that he should not have given Grant the last assignment.  (Doc. 42).

Rule 56(c)(2) of the Federal Rules of Civil Procedure provides: "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed.R.Civ.P. 56(c)(2).   The Advisory Committee Notes specify:

> Subdivision (c)(2) provides that a party may object that material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence. The objection functions much as an objection at trial, adjusted for the pretrial setting. The burden is on the proponent to show that the material is admissible as presented or to explain the admissible form that is anticipated. *There is no need to make a separate motion to strike* . If the case goes to trial, failure to challenge admissibility at the summary-judgment stage does not forfeit the right to challenge admissibility at trial.

Fed.R.Civ.P. 56, *Adv. Comm. Notes,* "Subdivision(c)" (2010 Amendments) (emphasis added).

*See, e.g.,* Campbell v. Shinseki, 546 Fed. Appx. 874, 879 (11th Cir. 2013) ("[t]he plain meaning of these provisions show that objecting to the admissibility of evidence supporting a summary judgment motion is now a part of summary judgment procedure, rather than a separate motion to be handled preliminarily[]").   As motions to strike are thus disallowed, the Court construes MCDean's motion as Objections, to be overruled or sustained.

First, the deposition testimony of non-parties Shawanna Whitehead (Doc. 39-6 at (Dep. Whitehead at 18-19, 21)) and Vonique Sanks (Doc. 39-5 at 2 (Dep. Sanks at 15)) -- wherein each testify that on November 29, 2020 "I heard Justin [Grant] tell Kent Bowman that he was tired" or

that he was "really tired" but was willing to take the job, the night before the accident.[3]  Davis characterizes this testimony as proof that Grant was too tired to drive the next day (*i.e.*, Grant's physical or mental condition).  MCDean objects based on hearsay.  Hearsay is a statement "(1) that the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c). Hearsay may be considered on summary judgment, however, if such could be reduced to admissible form at trial. Hosea v. Langley, 2006 WL 314454, *8 (S.D. Ala. Feb. 8, 2006); Jones v. UPS Ground Freight, 683 F.3d 1283, 1293–1294 (11th Cir. 2012); Macuba v. Deboer, 193 F.3d 1316, 1322 (11th Cir. 1999).  Grant's statements constitute Rule 801(d)(2)(A) statements of a party opponent.  Thus, MCDean's objection is **OVERRULED.**

Second, Davis submits Grant's work schedule in the 3 months before the accident as Rule 401 relevant evidence of his history of being tired and overworked (his condition) by MCDean to show that it is more probable than not that he was too tired to be driving at the time of the  accident. MCDean objects based on relevance and prejudice. Per Davis, Grant worked in excess of 40 hours -- "consistently working 50, 60, 70, and even 80+ hour *work weeks*[]" (Doc. 39 at 9) -- from August 17, 2020 to November 22, 2020 (ranging from 41.17 hours to 82.5 hours) for the following timeframes: 8/17-23 81 hours; 8/24-30 82.5 hours; 8/31 to 9/6 48 hours; 9/7-13 54.5 hours; 9/14-20 46.28 hours; 9/21-27 41.17 hours; 9/28 -10/4 49.83 hours; 10/5-11 76.5 hours; 10/12-18 69.17 hours; 10/19-25 53.5 hours; 10/26-11/1 63.58 hours; 11/2-8 66 hours; 11/9-15 52.69 hours; and 11/16-22 56.75 hours.  (Doc. 39-8; Doc. 39 at 9-10)).  Based on those totals/numbers, Davis argues that Grant's work history reveals that he was constantly driving, overworked, fatigued, dangerous,

---

3 Sanks was Grant's girlfriend and Whitehead is Sanks' mother.

and putting people's lives at risk having to speed while driving to get from one job to the next, and regularly working more than 40 hours in 5 straight day work week.  (Id.)

While the evidence of work history may be relevant, it has little probative value.  A review of the timeframe just before the November 30, 2020 accident -- November 23 to November 29 -- reveals that Grant worked as follows: November 23 7 hours (4.50 regular and 2.50 driving); November 24 13.33 hours (4.83 driving and 8.50 regular); November 25 3.50 hours (2.50 driving and 1 hour regular); November 26 day off; November 27 day off; November 28 day off; November 29 day off.  (Doc. 39-8 at 3).  Thus, Grant's work schedule before he took 4 1/2 days of time off has little relevance to his condition *at the time of the accident*, particularly as he had no driving events/issues/incidents during the entire 14 months of his employment with MCDean.

Third, as to the September 8, 2021 accident involving a different MCDean employee almost nine (9) months *after* the accident in this case -- Davis submits this evidence to prove that MCDean worked its employees too hard and so presumably must have previously done the same for Grant.  MCDean's objects based on relevance (the accident is not substantially similar) and inadmissibility.  The objection is **SUSTAINED**. This accident is irrelevant because Davis' claims hinge on *Grant's* specific condition and *Grant's* specific work/driving habits.  See, e.g., Hessen v. Jaguar Cars Inc., 915 F.2d 641, 650 (11th Cir. 1990) (discussing prior incidents); Hyde v. Wages, 454 So.2d 926, 931-932 (Ala. 1984) ("evidence of accidents which occurred at other cement companies *after* the date of the accident made the basis of this suit, was inadmissible, and was prejudicial. The judgment entered on the jury verdict ... is due to be reversed on this additional ground[]") (emphasis in original) (citing MCCORMICK ON EVIDENCE § 200, p.475 (2d Ed. 1972) ("While evidence of similar accidents ... is, under certain circumstances, admissible, 'the other happening must have occurred before the injury sued for[]") and 65A C.J.S., NEGLIGENCE § 234(6)

(1960) ("'[e]vidence of other accidents or injuries occurring subsequent to the one in question is not admissible on the issue of knowledge' of the defendant at the time of the accident made the basis of the lawsuit[]'")).

Fourth, Davis submits Bowman's alleged post-accident statement ("I never should have gave [sic] him that last assignment[]") to non-party Shawanna Whitehead during a telephone conversation after she notified him of Grant's death (Doc. 39-6 at 4 (Dep. Whitehead at 23)), as a Rule 801(d)(2)(A) statement by a party opponent and as a Rule 803(2) excited utterance. MCDean objects based on hearsay, relevance, and as an improper appeal to the jurors' sympathy which is prejudicial under Rule 403. The statement, as referenced in Whitehead's deposition testimony, could be reduced to an admissible form at trial via the live testimony of declarant Bowman, and thus may be considered on summary judgment. Additionally, Bowman's statement is relevant and probative, as to the reasons why he stated as much, which he could explain at trial. Moreover, Bowman's statement about a job assignment to Grant as MCDean's employee was made "by a party in an individual or a representative capacity[]" attributable to the company under Rule 801(d)(2)(A). Bowman's statement could also be admissible because it was "made by the party's agent or employee on a matter within the scope of that relationship" under Rule 801(d)(2)(D). Further, the statement may also be admissible under Rule 803(2) excited utterance -- "relating to a startling event or condition, made while the declarant was under the stress of excitement that it caused." See, e.g., Fed. R. Evid. Rule 803(2) Adv. Comments: "The theory ...is simply that circumstances may produce a condition of excitement which temporarily stills the capacity of reflection and produces utterances free of conscious fabrication[]" and "[w]hile the theory .... has been criticized on the ground that excitement impairs accuracy of observation as well as eliminating conscious fabrication ... it finds support in cases without number. See cases in 6

Wigmore § 1750; Annot. 53 A.L.R.2d 1245 (statements as to cause of or responsibility for motor vehicle accident)[] ..."  Thus, MCDean's objection are **OVERRULED.**

## III.  <u>Motion to Exclude, in Part, Plaintiff's Expert Witness Gary Johnson</u>

MCDean moves to exclude and limit certain testimony of Plaintiff's expert witness, accident reconstructionist Gary Johnson (Johnson), as failing to satisfy the minimum Rule 702 admissibility standards under the <u>Federal Rules of Evidence</u> and/or <u>Daubert v. Merrell Dow Pharm.</u>, 509 U.S. 579 (1993).[4] As grounds, MCDean argues that Johnson's opinion regarding Grant's fatigue at the time of the accident (that "Mr. Grant had driven for 3 hours and 34 minutes without any kind of break having started at 5 AM. His fatigue likely played a major role in the crash[]" (Doc. 40-1 at 21 (Report Johnson))) fails to apply scientific methodology; is not based on sufficient facts/data; is speculative; and is unhelpful to the jury.  MCDean argues exclusion is proper because Johnson admitted that he based his conclusion on only two things: 1) Grant was driving for 3 hours, 34 minutes; and 2) Johnson claims Grant "missed his turn" onto Highway 31 S. (Doc. 40-1 (Dep. Johnson at 69)).  Per MCDean, Johnson did not rely on anything about Grant himself to render those opinions (sleep habits, medical records, medical history, work history, etc.), adding that whether he missed a turn is factually dubious, and noting that Johnson did not apply the NTSB scientific method to investigate fatigue to arrive at his opinion.

In contrast, Davis argues that Johnson is a well-qualified accident reconstructionist whose opinions are relevant and reliable and satisfy the <u>Federal Rules of Evidence</u> and/or <u>Daubert</u>

---

4 In <u>Daubert</u>, 509 U.S. 579, the U.S. Supreme Court imposed a special duty on trial judges pursuant to Rule 702, requiring the judge to act as a "gate-keeper" to ensure that scientific evidence is both reliable and relevant before it is admitted. <u>Id</u>. <u>Daubert</u> also requires a special inquiry into relevance, calling on the trial court to ensure that expert testimony logically advances a material aspect of the proposing party's case. <u>Allison v. McGhan Med. Corp.</u>, 184 F.3d 1300, 1312 (11th Cir. 1999). In sum, there must be a valid scientific connection between the testimony and the disputed facts in the case (*i.e.,* "fit"). <u>Id</u>.

standards.  (Doc. 46).  In support, Davis submits a *new* Affidavit from Johnson on summary judgment.  (Doc. 46-1 (Aff. Johnson)). In the Affidavit, Johnson specifies that in arriving as his findings, he considered the following: Grant was traveling for an extended amount of time without regular driving breaks, very early in the morning; he missed a clearly marked turn within 10 miles of the wreck and was forced to double back; his van slowly drifted across the center line of the road coming out of a curve, combined with the fact that he made no efforts to avoid the wreck in any manner, unaware that the wreck was even about to happen; and while Grant's slow drift could have been distraction, the more likely cause was fatigue based on the circumstances.  (Id.)

In reply, MCDean argues that the Affidavit of Johnson, particularly Paragraphs 15-18, 22-23, which are entirely <u>new</u> opinions of this expert, should be excluded.

## A.     <u>Standard of Review</u>

"While Federal Rules of Evidence 401 and 402 provide for the liberal admission of relevant evidence, Rules 403, 702, and 703 mitigate against this general policy by giving trial courts discretion to exclude expert testimony that is either unreliable or irrelevant." Johnson v. Louisville Ladder, 2008 WL 5122261, 7 (S.D. Ala. Nov. 14, 2008) (citing Allison v. McGhan Med. Corp., 184 F.3d 1300, 1310 (11th Cir. 1999). In Kilpatrick v. Breg, Inc., 613 F.3d 1329, 1335 (11th Cir. 2010), the Eleventh Circuit explained the standard in Daubert as follows:

> *Daubert* requires that trial courts act as "gatekeepers" to ensure that speculative, unreliable expert testimony does not reach the jury. 509 U.S. at 597, n. 13, 113 S.Ct. 2786, 125 L.Ed.2d 469. The trial court must "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho* [Tire Co., Ltd. v. Carmichael], 526 U.S. 137, 152... [(1999)].

Similarly, Rule 702 governs the admission of expert testimony in federal court, and provides that:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an

10

expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Applying these principles, expert testimony may be admitted if three (3) requirements are met. Louisville Ladder, *supra* (citing Tuscaloosa v. Harcros Chem., Inc., 158 F.3d 548, 562 (11th Cir. 1998)).   First, the expert must be qualified to testify competently regarding the matter he intends to address. Id. at *7.  Second, the methodology by which the expert reaches his conclusion used must be sufficiently reliable as determined by a Daubert inquiry. Id. Third, the testimony must assist the trier of fact through the application of scientific, technical, or specialized expertise to understand the evidence or determine a fact in issue.  Id. Kilpatrick, 613 F.3d at 1335. And "[t]he proponent of the expert testimony bears the burden of showing, by a preponderance of the evidence, that the testimony satisfies each prong." Hendrix ex rel. G.P. v. Evenflo Co., Inc., 609 F.3d 1183, 1194 (11th Cir. 2010).

For reliability, courts look to the following: 1) whether the expert's methodology has been tested or is capable of being tested; 2) whether it has been subjected to peer review and publication; 3) the known or potential rate of error of the theory or technique; and 4) whether the technique has been generally accepted in the proper scientific community. See, e.g., Phillips v. America Honda Motor Co., Inc., 238 Fed. Appx. 540 (11th Cir.2007) (excluding expert testimony where there was no reliable link between the expert's data and the facts in the case). "[W]here [expert] testimony's factual basis, data principles, methods, or their application are called sufficiently into question ... the trial judge must determine whether the testimony has a 'reliable basis' in the knowledge and experience of [the relevant] discipline." Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 119 (1999). This "'gate-keeping' inquiry must be tied to the facts of a particular case." Id.  The expert's

testimony must be helpful to, or "fit" with, the factual issues to be resolved -- i.e., the district judge must determine whether the expert's reasoning and methodology can be properly applied to the facts. Daubert, 509 U.S. at 591–592. Trial courts must screen expert testimony to ensure that it is both reliable and that it "relate[s] to any issue in the case" (*i.e.*, "fit"). Id. at 590–591.

For relevance and Rule 702, "it is the responsibility of the trial judge to ensure that an expert is sufficiently qualified to provide expert testimony that is relevant to the task at hand and to ensure that the testimony rests on a reliable basis." Beaudette v. Louisville Ladder, Inc., 462 F.3d 22, 25 (1st Cir. 2006) (excluding expert testimony). As for relevance,

> ... the *Daubert* Court imposed a special relevancy requirement.... To be admissible, expert testimony must be relevant not only in the sense that all evidence must be relevant ... but also in the incremental sense that the expert's proposed opinion, if admitted, likely would assist the trier of fact to understand or determine a fact in issue.... In other words, Rule 702, as visualized through the *Daubert* prism, "requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility"....

Ruiz–Troche v. Pepsi Cola of P.R. Bottling Co., 161 F.3d 77, 81 (1st Cir.1998) (citations and quotations omitted). Likewise, a court must always keep in mind the maxim that expert testimony must "assist the jurors in deciding the particular issues in the case." Kumho, 526 U.S. at 156–157. Expert testimony is thus excludable when the factual bases are unsupported and/or the testimony will not assist the jury. See, e.g., Davidov v. Louisville Ladder Group, LLC, 2005 WL 486734, *2 (S.D.N.Y. Mar. 1, 2005) (excluding expert report that was inconsistent with facts of case).[5]

---

[5] See, *e.g.*, Housing Works, Inc. v. Turner, 362 F.Supp.2d 434, 447–448 (S.D.N.Y. 2005) (excluding illogical expert report that failed to address facts that would, by common sense, dictate different conclusions from those reached by the expert); Macaluso v. Herman Miller, Inc., 2005 WL 563169, *6-8 (S.D.N.Y. Mar. 10, 2005) (excluding expert testimony where expert's analysis was based, in part, on incorrect factual assumptions that rendered all of his subsequent conclusions "purely speculative" and where expert's assumptions contradicted plaintiff's testimony and description of the accident); Mink Mart, Inc. v. Reliance Ins. Co., 65 F.Supp.2d 176, 181 (S.D.N.Y.1999) (excluding expert report where it was based on speculation and not the evidence).

**B.**   <u>**Issues**</u>

As there is no apparent dispute as to Johnson's qualifications, the Court addresses his methodologies (reliability) and helpfulness to the fact finder (relevance).  MCDean contends that Johnson failed to follow existing scientific methodology such that his opinions as to Grant's fatigue are not the product of scientific study, and thus, are unreliable and should not be considered on summary judgment or at trial.   Per MCDean, Johnson lacked sufficient knowledge of basic underlying facts to arrive at his fatigue opinions because he: was unaware of Grant's sleep habits; unaware of any facts relating to circadian rhythms; did not review Grant's medical records; did not know anything about Grant's medical history nor whether he was taking any medications; formed his opinions without reviewing a single deposition; formed his opinions without knowing anything specific about Grant's work history in the week prior to the accident; bases his fatigue opinion on his speculation that Grant "missed a turn" but also testified that it could have been due to distraction; and concluded that the simple passage of driving time -- 3 hours 34 minutes driving time without stopping -- necessarily means Grant was fatigued.  (Doc. 40).

Additionally, per MCDean, Johnson's fatigue opinions are not helpful to the fact finder because they do not concern matters beyond the understanding of an average person and will not assist the jury (*i.e.*, unhelpful).  MCDean asserts: "[t]he effects of driving extended periods of time are generally known by the 'average man.' ... the jury can decide for itself whether Grant was fatigued based on the number of hours he drove (3 ½ hours), and whether that fatigue, if any, proximately caused or contributed to the subject collision ... such matters are not outside the average person's understanding."  (Doc. 40 at 10).  In support MCDean cites <u>Bridges v. Enter. Prod. Co</u>., 2007 WL 465738 (S.D. Miss. Feb. 8, 2007) (Doc. 46-11) involving expert testimony opinions regarding fatigue in relation to a trucking accident, in which the Court ruled that the

expert opinions regarding the driver's fatigue and whether such proximately caused the accident were not required to assist the jury in understanding evidence or the facts as "the effects of driving for extended periods of time are generally known by the 'average man'[] and so "the jury can decide for itself whether... [the driver] was fatigued..." Id. at *4. In response, Davis argues that Johnson's opinions are expert not lay opinions, helpful to the jury *because they are not limited to fatigue*: "[t]he case at hand does not involve the mere effects of driving an extended time." (Doc. 46 at 16).

Because MCDean's motion is limited to Johnson's fatigue opinions, the Court first asks whether such would be helpful to the fact finder.  Johnson's opinions regarding Grant's fatigue -- in isolation -- are unhelpful to the jury because such is within that which is generally known by the average man.  Johnson's fatigue opinions do not involve the application of scientific, technical, or specialized expertise to understand the evidence or determine a fact in the case.  And this determination eliminates any need for the Court to assess Johnson's methodologies *regarding fatigue*.  As such, MCDean's motion to exclude Johnson's fatigue opinions is **GRANTED** in that such have been removed from consideration on summary judgment.  See, e.g., Bridges, 2007 WL 465738 at *4 ("Maxwell's opinions regarding whether Toulmon was fatigued and whether that fatigue proximately caused the subject collision are not required to assist the jury in understanding the evidence or facts in this case ... the effects of driving extended periods of time are generally known by the 'average man.' Therefore, the jury can decide for itself whether Toulmon was fatigued based on the number of hours he drove, and whether that fatigue, if any, proximately caused or contributed to the subject collision[]"); Ryans v. Koch Foods, LLC, 2015 WL 11108937, *6 (E.D. Tenn. Jul. 16, 2015) ("The effects of fatigue on a driver are matters of common knowledge[]").

14

IV.   **<u>Conclusions of Law</u>**[6]

MCDean moves for partial summary judgment on certain claims alleged against it in Davis'

Amended Complaint: 1) wantonness; 2) negligent entrustment; and 3) negligent hiring, training,

supervision, and retention.

Pursuant to the standard of review, "[]the court shall grant summary judgment if the movant

shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment

as a matter of law." FED. R. CIV. P. 56(a).   Rule 56(c) provides as follows:

> *(c) Procedures*
> *(1) Supporting Factual Positions.* A party asserting that a fact cannot be or is
> genuinely disputed must support the assertion by:
>
> **(A)** citing to particular parts of materials in the record, including depositions,
> documents, electronically stored information, affidavits or declarations,
> stipulations (including those made for purposes of the motion only), admissions,
> interrogatory answers, or other materials; or
>
> **(B)** showing that the materials cited do not establish the absence or presence of a
> genuine dispute, or that an adverse party cannot produce admissible evidence to
> support the fact.
>
> *(2) Objection That a Fact Is Not Supported by Admissible Evidence.* A party may
> object that the material cited to support or dispute a fact cannot be presented in a
> form that would be admissible in evidence.
>
> *(3) Materials Not Cited.* The court need consider only the cited materials, but it
> may consider other materials in the record.
>
> *(4) Affidavits or Declarations.* An affidavit or declaration used to support or oppose
> a motion must be made on personal knowledge, set out facts that would be
> admissible in evidence, and show that the affiant or declarant is competent to testify
> on the matters stated.

FED.R.CIV.P. Rule 56(c).

---

6  Alabama law applies. <u>Parks Institute v. Target Corp.,</u> 812 F.3d 824, 829 (11th Cir. 2016) ("[A]
federal court sitting in diversity applies the substantive law of the state in which it sits[]").

The party seeking summary judgment bears the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). If the nonmoving party fails to make "a sufficient showing on an essential element of her case with respect to which she has the burden of proof," the moving party is entitled to summary judgment. Celotex, 477 U.S. at 323. "In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determinations of the truth of the matter. Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Tipton v. Bergrohr GMBH-Siegen, 965 F.2d 994, 998-999 (11th Cir. 1992).

## A.    **Wantonness**

In Alabama wantonness requires "the conscious doing of some act or the omission of some duty while knowing of the existing conditions and being conscious that, from doing or omitting to do an act, injury will likely or probably result." Ex parte Essary, 992 So.2d 5, 9-10 (Ala. 2007).[7] "To establish wantonness, the plaintiff must prove that the defendant, with reckless indifference to the consequences, consciously and intentionally did some wrongful act or omitted some known

---

[7] As noted in Malish v. Hurst, 2019 WL 922251, *5 (M.D. Ala. Jan. 24, 2019): "In *Essary*, the Alabama Supreme Court set forth a well-recognized presumption to be applied to claims of wantonness. 992 So. 2d at 12. This presumption, often referred to as the *Essary* presumption, states that courts do not expect people to "engage in self-destructive behavior" and will presume against wantonness when the risk of injury to the actor is as real as the risk of injury to others. *Id.* Of course, this presumption is not without exception. Indeed, if (1) there is "some evidence of impaired judgment," such as alcohol consumption, (2) the conduct "is so inherently reckless that [the court] might otherwise impute to [the actor] a depravity consistent with disregard of instincts of safety and self-preservation," or (3) "the risk of injury to the actor is somehow not as real as the risk of injury to others," the presumption does not apply. *See Griffin v. Modular Transp. Co.*, No. 2:12-CV-2378-WMA, 2014 WL 896627, at *3 (N.D. Ala. March 6, 2014)."

duty." Hilyer v. Fortier, 227 So.3d 13, 22–23 (Ala. 2017) (internal citations omitted).  Reckless is defined as "careless, heedless inattentive; indifferent to the consequences ... marked by lack of proper caution: careless of consequence ... having no regard for consequences; uncontrolled; wild." Berry v. Fife, 590 So.2d 884, 885 (Ala. 1991) (citations omitted).  "Wantonness is not simply a more severe version of negligence, but is an entirely different tort concept ... wanton misconduct is characterized by the state of mind of consciously taking an action with knowledge that 'the doing or not doing of [the act] will likely result in injury ....' ..." Green v. Markovitch, 385 F.Supp.3d 1190, 1195 (N.D. Ala. Apr. 19, 2019) (internal citations omitted).  As explained in Hagen v. Pelletier, 2019 WL 4894544, *4 (N.D. Ala. Oct. 2, 2019) (footnote omitted (citing Essary, supra)):

> To prevail, the plaintiff does not need to show that "the actor kn[ew] that a person [wa]s within the zone made dangerous by his conduct" or that the actor "entertained a specific design or intent to injure the plaintiff" ..... *Id.* Rather, the plaintiff need only show that "the actor is 'conscious' that injury will likely or probably result from his actions." *Id.* Demonstrating this consciousness of injury requires the plaintiff to overcome a rebuttable presumption of the driver's instincts for self-preservation. *Id.* at 12 (noting courts "do not expect an individual to engage in self-destructive behavior"). In the context of an automobile accident, this entails showing that the driver was either so dispossessed of his "normal faculties, such as from voluntary intoxication [that he was] indifferent to the risk of injury to himself" or that his act was "so inherently reckless" that he showed "depravity consistent with disregard of instincts of safety and self-preservation." *Id.* Put simply, a wantonness determination is wholly fact-dependent. *Central Alabama Electric Cooperative v. Tapley*, 546 So. 2d 371 (Ala. 1989).
>
> As a fact-dependent inquiry, wantonness is a question for the jury, and a court may grant summary judgment on a wantonness claim only when "there is a total lack of evidence from which the jury can reasonably infer wantonness." *Cash*, 603 So. 2d at 1003. Alabama courts have denied summary judgment on wantonness claims when "fair minded persons in the exercise of impartial judgment could reach different conclusions as to the existence of wantonness." *Berry v. Fife*, 590 So. 2d 884, 887 (Ala. 1991) (reversing grant of summary judgment where a defendant accelerated into an intersection after mistaking a rock hitting the car's windshield for a gunshot). Denial of summary judgment is proper where either a jury could reach different conclusions on whether the undisputed facts constitute wantonness[] or there is a genuine issue of material fact as to whether the driver engaged in wanton behavior.

"[F]or the wantonness [claims] .... to survive summary judgment, the court would still have to conclude that Plaintiff[] ... presented sufficient evidence that, knowing the existing conditions surrounding the accident, ... [the defendant] was conscious h[is] actions would likely or probably cause injury to another, or that []he acted with reckless disregard for the same. Essary, 992 So. 2d at 9. Then, and only then, should Plaintiffs' wantonness claim be submitted to the jury. Cash, 603 So. 2d at 1003." Malish, 2019 WL 922251 at *6.  The "[d]etermination of consciousness that underlies the question of wantonness may rely on inferences drawn from the circumstances." Jinright v. Werner Enter., Inc., 607 F. Supp. 2d 1274, 1276 (M.D. Ala. 2009).

Davis' wantonness claim against MCDean appear to be based on Grant's conduct which Davis asserts that MCDean ratified: "continuously and knowingly allow[ed] Grant to drive at high rates of speed [and] drive while sleepy." (Doc. 39 at 13)  As explained in Pickens v. Guy's Logging Co., 2018 WL 3732686, *3 (N.D. Ala. Aug. 6, 2018): "'*Respondeat Superior*" is not an independent cause of action or claim ... it is a doctrine under which a plaintiff may recover against an employer defendant for an employee's ... wanton conduct when the employee was acting within the scope of his or her employment. *See Newsome v. Mead Corp.*, 674 So. 2d 581, 583 (Ala. Civ. App. 1995).."  To link an employer's wantonness liability to that of its employee under this doctrine, the underlying conduct of the employee must be proven.  "[A]n employer could be liable for the intentional torts of its agent if the employer participated in, authored, or ratified the wrongful acts, but [ ] to prove such liability one must demonstrate, among other things, *the underlying tortious conduct of an offending employee[]*") (internal quotation marks and punctuation omitted) (emphasis in original). Jones Exp., Inc. v. Jackson, 86 So.3d 298, 304–305 (Ala. 2010). As such, to prevail on summary judgment, the employer movant must establish the absence of any genuine issues of material fact as to its employee's conduct.

To establish Grant's alleged wanton conduct, Davis claims that the evidence shows that Grant was speeding around a curve, that he knew he was fatigued but continued to drive and then fell asleep at the wheel. As to the latter two facts, **knowing** he was too fatigued to drive and that he fell asleep, there is insufficient evidence to support either contention. And speeding around a curve and being fatigued (which taking the evidence in a light most favorable to Davis shows) are insufficient to establish that Grant was "dispossessed of his 'normal faculties, such as from voluntary intoxication [that he was] indifferent to the risk of injury to himself' or that his act was 'so inherently reckless' that he showed 'depravity consistent with disregard of instincts of safety and self-preservation.'" Central Alabama Electric Cooperative v. Tapley, 546 So. 2d 371 (Ala. 1989).[8] Accordingly, MCDean's motion for summary judgment as to wantonness is **GRANTED**.

## B.      Negligent Entrustment as to MCDean (and hiring and retention)

To state a claim for negligent entrustment in Alabama, a plaintiff must show "(1) an entrustment of the vehicle; (2) to an incompetent; (3) with knowledge that he is incompetent; (4) negligent ... use of the entrusted vehicle which proximately cause the plaintiff's damages; and (5) damages." White v. Miller, 2018 WL 6181170, *2 (N.D. Ala. Nov. 27, 2018). See also e.g., Prill v. Marrone, 23 So.3d 1, 8 (Ala. 2009); Halford v. Alamo Rent–A–Car, LLC, 921 So.2d 409, 412 (Ala. 2005); Mason v. New, 475 So.2d 854, 856 (Ala. 1985). In the motor vehicle accident context, negligence by the driver is "but one of the necessary elements[]" as "what has to be shown" is the driver's incompetence. Mason, 475 So.2d at 856. "The doctrine of negligent entrustment is founded on the primary negligence of the entrustor in supplying a motor vehicle to an incompetent driver,

---

[8] Disapproved of on unrelated grounds by Robbins v. Sanders, 927 So.2d 777 (Ala. 2005)); Alabama Power Co. v. Capps, 519 So.2d 1328 (Ala. 1988); Alabama Power Co. v. Cantrell, 507 So.2d 1295 (Ala.1986); Alabama Power Co. v. Brooks, 479 So.2d 1169 (Ala. 1985); Bush v. Alabama Power Co., 457 So.2d 350 (Ala.1984); Black Warrior Elec. Membership Corp. v. McCarter, 115 So.3d 158, 163-164 (Ala. 2012).

with manifestations of the incompetence of the driver as a basic requirement of the negligent entrustment action." Id. Additionally, "'[n]egligence is not synonymous with incompetency. The most competent may be negligent .... *But one who is habitually negligent may on that account be incompetent.*' ..." Pritchett v. ICN Med. Alliance, Inc., 938 So.2d 933, 941 (Ala. 2006) (internal citations omitted and emphasis in original). See also Edwards v. Valentine, 926 So.2d 315, 321-322 (Ala. 2005) (negligent entrustment may be shown by the driver's "'general incompetence' or habitual negligence[]'"). Proof of negligent entrustment may be established by evidence of prior acts of negligent or reckless driving, prior accidents, or prior acts of driving while intoxicated. Id. at 322. The same applies to the claim of negligent hiring and retention. Claussen v. PowerSecure, Inc., 2019 WL 4941109, *5 (M.D. Ala. Oct. 7, 2019).

MCDean argues that Davis' negligent entrustment and negligent hiring and retention claims fail because there is no evidence to support a finding that Grant was incompetent, or that even if he was, that MCDean had knowledge of his incompetency. In support, MCDean references the Georgia motor vehicle record report obtained for Grant when he was hired, which revealed that he only had two (2) traffic citations in the prior seven (7) years, his driver's license was not suspended or revoked, and he had no record of involvement in any accidents prior to being hired or during his employment.

In response, Davis acknowledges that Grant's two (2) traffic violations "are not enough to prove negligent entrustment[]" against MCDean. (Doc. 39 at 14). Davis instead argues that MCDean's knowledge of those violations -- coupled with the fact that it "was overworking its employees by requiring them to work long hours and drive risky distances to cover an extremely large territory with impossible deadlines[]" and MCDean supervisors received but ignored weekly

Geotab monitoring reports on employee's driving -- constitutes negligent entrustment.  (Doc. 39 at

17).  Specifically, Davis argues as follows:

> M.C. Dean also knew the impossible deadlines, [] and its constant monitoring of employee driving speeds and receiving weekly reports of such things, put M.C. Dean on notice of Grant′s propensity to travel well above the speed limit. But, M.C. Dean did nothing to stop it from happening going forward, because they knew the drivers had to travel at high rates of speed to meet those deadlines ....
>
> ***
>
> .... the facts show that M.C. Dean knew Grant regularly drove at a high rate of speed as M.C. Dean′s supervisors received a weekly report of it from its GPS monitoring system, and also knew of the long hours being worked by Grant, which made Grant as dangerous as a drunk driver by Defendant′s own admission. M.C. Dean still made the choice to put Grant on the road that morning with full knowledge of the danger and likely consequences of him falling asleep behind the wheel. Thus, not only did M.C. Dean know that Grant was an incompetent driver in that sleepy condition, M.C. Dean is the one that caused Grant to be a fatigued driver, who was incompetent as a result of that fatigue ...

(Doc. 39 at 14-15, 18-19 (footnote omitted)).  In further support, Davis references Bowman's

statement that he should not have given Grant the last assignment, the discovery of a urine jug in

Grant's van post-accident, and her claim that Grant fell asleep at the wheel (resulting in the accident

due to being tired and overworked).

Based on the record (as opposed to Davis' speculation), there is insufficient evidence that

Grant was incompetent and/or that MCDean had knowledge that he was incompetent.  Specifically,

when MCDean entrusted its company van to Grant, it had no reason to believe that he was

incompetent and his driving record complied with the company's policies. Additionally, MCDean

representatives testified that post-hire, supervisors monitored Grant's driving data on a weekly

basis via the Geotab system, and there were no driving events/incidents recorded for over a 14-

month period including any or speeding -- *i.e.,* his driving data showed no problems or events

supporting the company's belief that he was a competent driver and that MCDean had no

knowledge of any incompetency.  There is nothing in the record establishing Grant's incompetency or a genuine issue of material fact regarding same.

Despite this, Davis *speculates* that for Grant to accomplish the assigned jobs in the "tight deadlines" provided, he would have *necessarily* had to regularly speed and drive in an incompetent and negligent manner and that MC Dean "knew" this (knew of his "propensity to travel well above the speed limit[]") but "did nothing to stop it from happening[]". (Doc. 39 at 14-15).  Davis cites **no evidence** in support of this sweeping assertion.  Instead, Davis cites only to the depositions of David Beatty (Doc. 39-10 (Dep. Beatty at 47-50)) and Troy Reynolds ((Doc. 39-11 (Dep. Reynolds at 23)) which provide no support for this contention.  On the cited pages Beatty simply testified about the purpose of Geotab monitoring and that Grant had no driving "events," and Reynolds testified about the company's general 4-hour response time for an emergency call to Home Depot. (*Id*.)  Additionally, Bowman's testimony clarifies that the 4-hour emergency response time was basically disregarded for Grant's assignment, as it was instead agreed for Grant to be there the next day -- "I told him to get there when he got there. He informed me he should be able to get there by 8:00 o'clock."  (Doc. 39-4 at 9, 14 (Dep. Bowman at 63, 113).  The result is that Davis' contentions about Grant's driving speeds and MCDean's knowledge of same -- as well as MCDean's work practices (overworking employees with impossible deadlines creating incompetent drivers) -- are rooted in speculation and conjecture, which does not create a genuine issue of fact. Cordoba v. Dillard's, Inc., 419 F.3d 1169, 1181 (11th Cir. 2005).

Moreover, while Davis also endeavors to link Grant's work schedule in the 3 months prior to the accident (working 40+hours/week) as *de facto* evidence of his propensity to speed and driving incompetence -- including on the day of the accident -- the Court cannot make that leap. And even though MCDean representatives testified to generalities -- that working 50+ hours/5 day

work week is unsafe and 60+ hours/5 day work week is dangerous (Doc. 39-2 (Dep. George at 57), Doc. 39-10 at 2-3 (Dep. Beatty at 47-50) -- Davis has not sufficiently linked (with supporting evidence) such to Grant's actual driving record (Geotab data) to establish a factual issue about incompetency while employed and/or on the day of the accident.

Further, Davis characterizes Bowman's alleged statement during the evening phone conversation -- that he "shouldn't have given him that last assignment" -- as "confirm[ation] that M.C. Dean knew they were overworking Grant and asking too much from him." (Doc. 39 at 16). However, the evidence submitted by Davis does not support this unilateral characterization on summary judgment, and Bowman testified that Grant did not express concerns about being overworked during that conversation. (Doc. 39-4 at 8 (Dep. Bowman at 62)). Such is insufficient to establish negligent entrustment.

And while Davis repeatedly speculates that Grant fell asleep resulting in the accident, such does not establish that Grant was incompetent (habitually negligent) or that MCDean knew of such incompetency during the prior 14 months. If anything, assuming *arguendo* that did occur, it was a *singular* event in Grant's otherwise uneventful 14 month driving record. Similarly, Davis provides no evidentiary support for its assertion about the reason for the alleged presence of a urine jug in Grant's van, only speculation, which is insufficient on summary judgment. Lastly, Davis appears to endeavor to avoid summary judgment by referencing what "[t]he evidence at trial will indicate[,]" which disregards her *current* evidentiary burden. (Doc. 39 at 17).

In the end, Davis has failed to create a genuine issue of material fact such that summary judgment is **GRANTED** in favor of MCDean on her negligent entrustment claim and her negligent hiring and retention claim. Polk v. Bang, 2021 WL 3577962, *5 (S.D. Ala. Aug. 12, 2021) ("there is not a shred of evidence to support this cause of action on ... negligent entrustment ... There is no

evidence that Bang had ever engaged in previous acts of negligent or reckless driving, that he had been in previous accidents, or that he otherwise qualified as 'incompetent' under Alabama law. Even if there were, there is no evidence that DH Transportation had knowledge or any reason to know of Bang's incompetence, that its efforts to screen him and monitor his performance disclosed any such evidence of incompetence, or that those screening activities were in any way deficient[]"); Brazeal v. Wills, 2008 WL 11423972, *8 (N.D. Ala. Apr. 24, 2008) ("[t]he 'doctrine of negligent entrustment is founded on the primary negligence of the entrustor in supplying a motor vehicle to an incompetent driver, with manifestations of the incompetence of the driver as a basic requirement ...' ... 'knowledge by the entrustor of the driver's incompetence is fundamental to the negligent entrustment claim; without proof of such knowledge, the negligent entrustment claim must fail[]'").

## C.    Negligent Training or Supervision

In Alabama, the torts of negligent training and supervision require a plaintiff to show that the employee was incompetent to operate a commercial vehicle and that the employer knew, or should have known, of this incompetence. Bailey v. DAS North America, Inc., 473 F. Supp.3d 1310, 1334 (M.D. Ala. 2020); Johnson v. Brunswick Riverview Club, Inc., 39 So.3d 132, 140 (Ala. 2009); Southland Bank v. A & A Drywall Supply Co., Inc., 21 So. 3d 1196, 1214-1215 (Ala. 2008); Halford v. Alamo Rent-A-Car, LLC, 921 So. 2d 409, 412 (Ala. 2005); See also Shaw v. City of Selma, 241 F. Supp.3d 1253, 1281 n.32 (S.D. Ala. 2017) ("[u]nder Alabama law, a critical element of a claim of negligent hiring ... and supervision is proof of the employer's actual or constructive awareness of the employee's incompetency[]") (citation and internal quotation marks omitted); Buckentin v. SunTrust Mortg. Corp., 928 F. Supp.2d 1273, 1288 (N.D. Ala. 2013) ("a plaintiff must demonstrate that the employer knew, or in the exercise of ordinary care should have known, that its employee was incompetent") (citations omitted); Edwards v. Hyundai Motor Mfg.

Alabama, LLC, 603 F. Supp. 2d 1336, 1357 (M.D. Ala. 2009)("the plaintiff must demonstrate that (1) the employee committed a tort recognized under Alabama law, ... (2) the employer had actual notice of this conduct or would have gained such notice if it exercised due and proper diligence, ... and (3) the employer failed to respond to this notice adequately[]") (citations and quotations omitted); Jones Exp., Inc. v. Jackson, 86 So. 3d 298, 304 (Ala. 2010) ("for an employer to be liable for the negligent hiring ... supervision of its employee, the plaintiff must also prove wrongful conduct on the part of the employee[]") (citations and quotations omitted).

This analysis entails establishing that "specific acts of incompetency [were within] the knowledge of the master," or that the acts were "of such nature, character, and frequency that the master, in the exercise of due care, must have had them brought to his notice." Id. A mistake or a single act of negligence by an employee does not constitute incompetency -- "the most competent [person] may [still] be negligent." Southland Bank, 21 So. 3d at 1216. Instead, *habitual negligence* is necessary for conduct to rise to the level of incompetence. Id.; Pritchett v. ICN Med. Alliance, Inc., 938 So. 2d 933, 941 (Ala. 2006)).  "Negligence is not synonymous with incompetency. The most competent may be negligent. *But one who is habitually negligent may on that account be incompetent.*'" Id. at 1216 (emphasis in original, citations omitted).  In the context of a commercial driver, "the incompetence of a driver is measured by the driver's demonstrated ability (or inability) to properly drive a vehicle." Halford v. Alamo Rent-A Car, LLC, 921 So. 2d 409, 413-14 (Ala. 2005) (declining to find a driver incompetent for a single non-moving violation).  See generally Wright v. McKenzie, 647 F. Supp. 2d 1293, 1297 (M.D. Ala. 2009); Armstrong Bus. Servs. v. AmSouth Bank, 817 So. 2d 665, 682 (Ala. 2001).  Thus, to sufficiently allege a claim for negligent failure to train or supervise, Davis must allege that MCDean caused the injuries because Grant was

incompetent and that MCDean knew or should have known of his incompetency -- as to his demonstrated ability (or inability) to properly drive a vehicle. Southland Bank, 21 So.3d at 1215.

Just as Davis' negligent entrustment claim against MCDean fails to survive summary judgment due to a lack of evidence establishing genuine issues of material fact with regard to Grant's incompetency and/or MCDean's knowledge of same, so do her negligent training and supervision claims. Indeed, "[u]nder Alabama law, the heart of the competency issue is whether the Plaintiff's evidence bears on [the employee/defendant's] 'ability (or inability) to properly drive a vehicle.'" Wright, 647 F. Supp. 2d at 1299 (quoting Halford v. Alamo Rent-A-Car, 921 So.2d 409, 413-414 (Ala. 2005)). Davis fails to submit evidence of Grant's inability to properly drive a vehicle, much less *habitual negligence*, instead relying on conjecture and speculation. Speculation does not create a genuine issue of fact. Cordoba, 419 F.3d at 1181. And the evidence on summary judgment establishes that Grant had a competent[9] driving record in the seven (7) years before being hired by MCDean and during his 14 months of employment (including zero incidents/events based on the company's Geotab driving monitoring data). Thus, summary judgment is **GRANTED** in favor of MCDean on these claims. Polk, 2021 WL 3577962, *6 (S.D. Ala. Aug. 12, 2021) ("there is not a shred of evidence to support this cause of action[]" because "[t]he record does not support a finding that Bang was incompetent, much less that DH Transportation knew or should have been

---

9 Examples of cases where a driving record has been deemed competent: Batton v. Oak Invest Group Corp., 2022 WL 662295 (N.D. Ala. Mar. 4, 2022) (six driving incidents (two with multiple charges) and no accidents during the 10 years before the collision, while not "a perfect driving record ... his citations do not indicate he was an incompetent driver or habitually negligent[]" under Alabama law); Williams v. Hickox, 2019 WL 2353049, *7 (M.D. Ala. May 31, 2019) (three violations and one accident, and a DUI more than 10 years old); Lanham v. Gnewuch, 2015 WL 3966480, *8-9 (N.D. Ala. June 30, 2015) (two preventable accidents in previous two years); Allen v. Con-Way Truckload, Inc., 2012 WL 3775735 (N.D. Ala. Aug. 23, 2012) ("[b]ecause no evidence establishes that Conway knowingly hired an incompetent driver, this claim of plaintiffs must fail as a matter of law[]"; Askew v. R&L Transfer, Inc., 676 F. Supp. 2d 1298, 1303 (M.D. Ala. 2009) (two moving violations and four minor accidents over previous nine years); Thedford v. Payne, 813 So. 2d 905, 912 (Ala. Civ. App. 2001) (one similar accident three months prior); Pryor v. Brown & Root USA, Inc., 674 So.2d 45, 52 (Ala. 1995) (two speeding tickets and a suspended DUI charge over 10 years).

aware of any such incompetence prior to the accident in question[]"); Askew v. R & L Transfer, Inc., 676 F. Supp. 2d 1298, 1304 (M.D. Ala. 2009) (because no evidence in the record suggests that the driver was incompetent, the claim of negligent supervision and training fails).

**V.   Conclusion**

Based on the foregoing, it is **ORDERED** that:

1) MCDean's Objections are **SUSTAINED in part** and **OVERRULED in part**;

2) MCDean's motion to exclude the testimony of Gary Johnson as to the fatigue of Grant is **GRANTED;**

3) MCDean's motion to exclude Gary Johnson's April 18, 2022 Affidavit is **MOOT;** and

3) MCDean's partial motion for summary judgment is **GRANTED** as to wantonness, **GRANTED** as to negligent entrustment (and negligent hiring and retention), and **GRANTED** as to negligent training and supervision;

4) The claims against fictitious parties and for compensatory damages are **DISMISSED**.

5)   The remaining claim for trial is whether Grant was negligent and proximately caused the accident.   (MCDean appears to admit that if Grant was negligent that they are liable under a *respondeat superior* theory.)

**DONE** and **ORDERED** this the **16th** day of **May 2022.**

/s/ Kristi K. DuBose
**KRISTI K. DuBOSE**
**UNITED STATES DISTRICT JUDGE**